# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. White*, 2011 IL App (1st) 092852

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALAN J. WHITE and DEMOND CARTER, Defendants-Appellants. |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-09-2852, 1-10-0094 cons. |
| Filed | December 23, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendants' convictions for first degree murder and attempted first degree murder arising from a gang- and drug-related shooting were affirmed over their arguments that the trial court abused its discretion in admitting cumulative prior inconsistent statements, that they were denied effective assistance of counsel by counsel's failure to request instructions on self-defense and second degree murder and their failure to move for a mistrial when a witness testified that a detective claimed one defendant had "beat so many murders," that the trial judge suggested the jury would need little time to reach a verdict, and that their right to a jury trial was violated when their sentences were enhanced based on the possession of a firearm. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-5385 (02); the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and David T. Harris, all of State Appellate Defender's Office, of Chicago, for appellant Alan J. White.

Jennifer L. Blagg, of Chicago, for appellant Demond Carter.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE EPSTEIN delivered the judgment of the court, with opinion.

Justices J. Gordon and Howse concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial, defendants Alan White and Demond Carter were convicted of first degree murder and attempted first degree murder. On appeal, Carter and White argue that (1) the trial court abused its discretion by admitting cumulative prior inconsistent statements and by sending copies of these statements back to the jury; (2) they were denied effective assistance of counsel because their trial counsel failed to request jury instructions on self-defense and second degree murder; (3) they were denied effective assistance of counsel because their trial counsel failed to move to strike or move for a mistrial when a witness testified that one of the detectives claimed that Carter had "beat so many murders"; (4) the trial judge committed reversible error when, through his comments at trial, he suggested that the jury should need little time to reach a verdict; and (5) the trial court violated defendants' right to a jury trial when it enhanced their sentences by 15 years based on the possession of a firearm. Additionally, Carter separately argues that he was denied his right to conflict-free counsel because his trial counsel represented a potential State witness. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND
¶ 3    Defendants Alan White and Demond Carter were charged with first degree murder of Chester Alexander and attempted first degree murder of Derrick Nelson in connection with a shooting on July 6, 2006. Carter and White were represented by separate counsel and were tried jointly before the same jury.

¶ 4                    I. Trial Testimony of Occurrence Witnesses
¶ 5    During the trial, the State presented the testimony of eight occurrence witnesses:

Larmarius Brooks, Derrick Nelson, Davon Turner, Geremy Johns, Charles Henderson, Tyrone Thomas, Michael Pitchford, and Shukeyina Godfrey. Although several of these witnesses provided prior statements identifying Carter, White, or both as the shooters, at trial all the witnesses testified that they did not see who fired shots.

¶ 6                      A. *Events Leading up to the Shootings*

¶ 7     Lamarius Brooks, known as "Bobo," sold drugs on the evening of July 6, 2006, at the corner of Wilcox and Keeler in Chicago. Brooks belonged to the Traveling Vice Lords gang, though he was selling drugs on a corner controlled by the Four Corner Hustlers. Carter and White pulled up to the corner in a car. The jury heard testimony that Carter and White were members of the Gangster Disciples and Four Corner Hustlers gangs, although the testimony did not specify who belonged to which gang. Carter got out of the car and asked Brooks for "rocks," or cocaine. Brooks gave Carter the cocaine, but Carter did not pay and instead told Brooks to "get the fuck on," which meant get off the corner. Brooks argued with Carter and White and then walked toward the house at 4231 West Wilcox, where Brooks' girlfriend, Re-Re, lived with her mother. Carter followed Brooks, who told Carter to return the drugs.

¶ 8     Carter then snapped his fingers and White hit Brooks over the head with a heavy metal object. Brooks ran into Re-Re's house to get a towel for his bleeding head. Carter and White went to a porch across the street that was a few houses down from Re-Re's house.

¶ 9     While in the house, Brooks called a fellow member of the Traveling Vice Lords gang, Chester Alexander. Brooks was angry because he had lost money and was injured. The jury heard testimony that Brooks was "running his mouth, steady talking, talking about wait until his man come pull up," referring to Alexander. Alexander arrived in a Range Rover, picked up Brooks, and drove to a gas station at Laramie and Jackson. En route, Alexander made a phone call and asked several "guys" to meet there. At the gas station they met six or seven other men, including Charles Henderson. Brooks, Alexander, Henderson, and five or six other men then drove to Keeler and Wilcox. As to the reasons for the group's return, Henderson testified that it was Alexander who eventually decided to go over to Keeler and Wilcox and "see what's going on." Henderson elaborated that the group went to back to the area to "[d]uke it out" and "do whatever," but when asked if he was "going to fight it out somehow, one way or another, fists, whatever it was going to be," Henderson replied, "Just fists."

¶ 10    When Brooks and Alexander returned to the area, Carter and White were still there, on the porch across the street and a few houses down from Re-Re's house. Derrick Nelson, Geremy Johns, Davon Turner, and Tyrone Thomas were near Re-Re's house when Brooks and Alexander returned. Michael Pitchford was also in the area. Brooks and Alexander testified that upon returning to Keeler and Wilcox, they did not carry or fire weapons, nor did anyone in their group.

¶ 11                             B. *The Shootings*

¶ 12    Sometime after Alexander and Brooks returned to Keeler and Wilcox, shots rang out. As the shots began, a crowd of people rushed into Re-Re's house. Nelson tried to enter with the

crowd, but he was shot once in the back. Shukeyina Godfrey, who was also in the area, ran eastbound on Wilcox toward Keeler and saw Alexander at the corner. Godfrey saw a white van driving along Wilcox turn onto Keeler, and as she continued running, she heard more gunshots from the area on Keeler that she had just passed. Alexander was found wounded in the grass at 142 S. Keeler and subsequently died from his injuries. His autopsy revealed four gunshot wounds.

¶ 13    All witnesses testified that they did not see who fired shots. For example, Johns testified that he heard "a lot of different shots coming from different places" and that the shots were "coming from everywhere *** from across the street, down the street." Turner testified that the shots were "coming from the opposite side of the street, but from gangways."

¶ 14        II. Prior Inconsistent Statements and Claims of Coercion and Intoxication

¶ 15    After all eight occurrence witnesses testified that they did not see the shooters, the State confronted all witnesses, except Godfrey, with prior inconsistent statements identifying or otherwise implicating White or Carter as the shooters. When the witnesses denied their prior inconsistent statements, the State introduced, through the testimony of several assistant State's Attorneys, both a written statement and grand jury testimony for six occurrence witnesses and a written statement for Pitchford. The jury also heard testimony from Detective Dan Gallagher as to the identification of defendants in photo arrays and lineups by several witnesses.

¶ 16    As detailed below, several witnesses testified that they were coerced to make statements or identifications by Detective Gallagher. Gallagher denied all accusations of threats and coercion and that he identified Carter and White to the witnesses. All assistant State's Attorneys testified that the witnesses provided statements voluntarily, never claimed they were coerced or threatened by police, and were not under the influence of drugs or alcohol.

¶ 17                                A. *Brooks*

¶ 18    In Brooks' prior written statement, he stated that he saw Carter go to a porch across the street after he gave Carter drugs, and he saw a dark-skinned black male in a white T-shirt shooting from the ground level near the porch. Brooks gave similar testimony to the grand jury. Brooks acknowledged at trial that he previously gave a statement and grand jury testimony, but denied saying that he saw a dark-skinned black man shooting toward him from across the street.

¶ 19                                B. *Nelson*

¶ 20    Nelson's prior statements included that he saw Carter and White on a porch across the street after the argument with Brooks. He then saw people shooting from that porch. In his written statement, he identified "a black guy" shooting from the porch, but when asked during his grand jury testimony if the shooter "might have been" White, Nelson responded "Yes." Nelson stated that he saw a white minivan driven by a black female stopped in the street, Carter and White jumped in the van, and the van then headed toward Keeler. Nelson

identified Carter in a photo array and in a lineup as someone he saw argue with Brooks and later enter a white minivan. He identified White in a photo array as the person who hit Brooks, and he identified White in a lineup as a person who entered a white minivan during the shooting. At trial, Nelson denied portions of his statement regarding Carter's and White's presence on the porch across the street or in the van, and he denied telling the grand jury that White was one of the shooters. Nelson also testified that Gallagher coerced him into implicating the defendants in his prior statements and that when Nelson identified someone other than defendants in the physical lineups, Gallagher had him choose Carter and White.

¶ 21                                        C. *Turner*

¶ 22       In his prior statements, Turner stated that he saw Carter "on the porch walking down the stairs shooting a gun" toward "everyone outside of Re-Re's." Turner also saw White "standing by a gate on ground level near the porch" where Carter stood and shooting a gun in Turner's direction. Turner identified Carter in a photo array as the shooter from the porch, and he identified White in a photo array as the shooter from the gate. At trial, Turner acknowledged his prior statements, but denied identifying the shooters. Turner, who was on home confinement, testified that police took him from his home in handcuffs and kept him until after his statement.

¶ 23                                        D. *Johns*

¶ 24       According to Johns' prior statements, Carter came down from the porch shooting with a gun and White fired a gun by a fence near the house where Carter was standing. Johns identified Carter in a photo array and lineup as the shooter from the porch, and Johns identified White in a photo array as the person who hit Bobo. At trial, Johns stated that he did not recall his statements identifying White and Carter as the shooters, but he acknowledged speaking to the police and the grand jury. Johns further testified that Detective Gallagher told him whom to identify in the photo arrays and that Gallagher harassed him and threatened to say he violated his probation to induce to him sign his written statement.

¶ 25                                        E. *Henderson*

¶ 26       In his prior statements, Henderson stated that Carter shot toward Re-Re's house from a porch across the street. Henderson identified Carter as the shooter from the porch in a photo array and lineup. At trial, Henderson testified that he did not recall viewing lineups or photo arrays or making the written statement or testifying before the grand jury, though he later recalled a portion of his grand jury testimony. Henderson explained that he is high "everyday" on various drugs and alcohol, and when asked if he remembered meeting with an assistant State's Attorney to give a written statement, he responded "I don't remember. I do a lot of drugs."

¶ 27                                        F. *Thomas*

¶ 28       Thomas said in his prior statements that Carter shot toward Re-Re's house from a porch

across the street. Thomas identified Carter as the shooter from the porch in a photo array and lineup. Thomas identified White in a photo array and lineup as the person who hit Bobo and as the person who entered a white minivan during the shooting. Thomas acknowledged his prior statements, but did not recall his statements about the shooters. He testified that Gallagher harassed him by coming to his house several times and banging on the doors and that Gallagher told him what to say in the written statement and whom to identify in the lineup.

¶ 29                                     G. *Pitchford*

¶ 30        In his prior written statement, Pitchford stated that he saw "a Range Rover pull up and guys get out," and that Carter was on the porch of a house "around 4242 West Wilcox." Pitchford further stated that he saw a van driven by a woman named Nesha, whom Pitchford identified as Carter's girlfriend. He saw "two other people in the seats behind the driver seat" that he did not see them clearly. Pitchford testified at trial that when he was brought to the police station, he was in possession of heroin, and Detective Gallagher told him he could go free if he signed a statement. Pitchford said that he signed the statement without reading it and then left without being charged for the heroin.

¶ 31                                 III. Expert Testimony

¶ 32        The State also called Detective John Rawski as a gang expert. He testified that around the time of the incident, the Brick Yard Fours, a subsect of the Four Corner Hustlers, controlled drug sales around the 4200 block of West Wilcox. Rawski testified that if a member of a different gang tried to sell drugs there without approval, he would be confronted and told to leave. Rawski testified that it is more likely that a gang would use a young kid without a gun to sell in rival territory, though he testified that it is not unusual for gang members engaged in drug sales to carry weapons. Rawski testified that if the seller encountered trouble, he would call his "influence," and Rawski would expect that the people who come to assist would be armed.

¶ 33                                 IV. Firearms Evidence

¶ 34        Forensic investigators recovered a total of 23 fired cartridge cases from the scene on West Wilcox, where Nelson was shot, and from the scene near 142 South Keeler, where Alexander was found. Bullet fragments were also recovered from the scene and from the body of Chester Alexander. Two State firearms experts testified that the incident involved the use of at least three guns, and one testified that there could have been as many as seven guns used. The jury also heard testimony regarding the execution of a search warrant on January 8, 2007 on an apartment at 4248 West Le Moyne. The police encountered Montrell Knight, a Gangster Disciple. They recovered nine guns, including a firearm commonly known as an AK-47 and an automatic handgun, both of which were used in the offense.

¶ 35                                   V. Conviction and Sentencing

¶ 36     Defendants were both found guilty of the first degree murder of Chester Alexander and
the attempted first degree murder of Derrick Nelson. White was sentenced to 50 years for
first degree murder, including a 15-year sentencing enhancement for possessing a firearm,
and a consecutive 10-year sentence on the conviction for attempted first degree murder.
Carter was sentenced to 55 years for first degree murder, also including a 15-year sentencing
enhancement for possessing a firearm, and a consecutive 15-year sentence for attempted first
degree murder.

¶ 37                                            ANALYSIS

¶ 38                                  I. Prior Inconsistent Statements

¶ 39     Defendants first argue that the trial court abused its discretion by admitting cumulative
prior inconsistent statements of six witnesses because the repetitive prior statements were
more prejudicial than probative. They next argue that when one prior inconsistent statement
was substantively admitted for each witness, the rule barring prior consistent statements
prevented admission of any other inconsistent statements that were consistent with the first.
Defendants additionally contend that the court committed reversible error by sending copies
of all prior inconsistent statements back to the jury during deliberations. We address each
argument in turn.

¶ 40                          A. *Evidence More Prejudicial Than Probative*

¶ 41     As to the admission of prior inconsistent statements as evidence, defendants concede that
they forfeited review of this issue, but challenge these errors under the plain-error rule, which
"bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved
claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).
A reviewing court will only apply the plain-error doctrine when

>     " '(1) a clear or obvious error occurred and the evidence is so closely balanced that
> the error alone threatened to tip the scales of justice against the defendant, regardless of
> the seriousness of the error, or (2) a clear or obvious error occurred and that error is so
> serious that it affected the fairness of the defendant's trial and challenged the integrity
> of the judicial process, regardless of the closeness of the evidence.' " *Id.* (quoting *People
> v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

"In plain-error review, the burden of persuasion rests with the defendant." *Id.*

¶ 42     The first step in applying the plain-error doctrine is to determine whether any error
occurred at all. *Id.* The admission of evidence lies within the discretion of the trial court, and
we review the trial court's decision to admit evidence for an abuse of discretion. *People v.
Becker*, 239 Ill. 2d 215, 234 (2010). "An abuse of discretion occurs where the trial court's
decision is arbitrary, fanciful or unreasonable [citation] or where no reasonable person would
agree with the position adopted by the trial court [citations]." *Id.*

¶ 43     At trial, several witnesses called by the State testified that they did not see the shooters.
For six of these witnesses, the State introduced the witnesses' prior written statements and

grand jury testimony, which generally identified Carter and White as the shooters. Carter and White concede that the prior written statements and grand jury testimony qualify as "prior inconsistent statements" and are otherwise admissible as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2006)). Defendants contend, however, that because the prior inconsistent statements were merely repetitive, their prejudicial effect substantially outweighed their probative value.

¶ 44    "Evidence is considered cumulative when it adds nothing to what was already before the jury." See *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009). At the outset, we acknowledge that all parties should refrain from "needless repetition of a witness's prior inconsistent statements." *People v. Fields*, 285 Ill. App. 3d 1020, 1028 (1996). In the instant case, however, presentation of the grand jury testimony was not merely cumulative of what was already before the jury. Rather, weeks or months after providing a written statement to assistant State's Attorneys in the presence of Detective Gallagher, the witnesses provided separate testimony, under oath, to the grand jury. We are mindful that the jury had to assess not only witness credibility, but also the witnesses' claims of coercion and intoxication. Ultimately, in light of all the previous inconsistent statements and testimony at trial, the jury had to assess the claims of these witnesses as to what happened at Keeler and Wilcox. We do not agree with defendants that presentation of the grand jury testimony added nothing to what was already before the jury.

¶ 45    Even if we were to characterize the second inconsistent statement for each witness as unnecessarily repetitive, the defendants have not cited any case where a court has found that the prejudicial effect of a substantively admitted prior inconsistent statement substantially outweighed its probative value merely because it was repetitive of a previously admitted prior statement. In fact, this court has found that even when the State presented a prior inconsistent statement that was "unnecessarily repetitive" of another, the repetition did not rise to the level of prejudice. See *Fields*, 285 Ill. App. 3d at 1028.

¶ 46    Defendants rely on *People v. Bedoya*, 325 Ill. App. 3d 926 (2001), but the prejudice found in that case–stemming from the admission of inflammatory other crimes evidence–is precisely what is lacking here. In *Bedoya*, the court found that the trial court erred in admitting evidence that the defendant fired shots at Cardinal Bernadin's residence, and repetition of the evidence simply enhanced the prejudicial effect. *Bedoya*, 325 Ill. App. 3d at 938-41. The *Bedoya* court did not find prejudice simply by the repetition of otherwise unobjectionable evidence. Where the only prejudice defendants identify from admitting the second prior inconsistent statement is the "prejudice of repetition," we find no error in admitting the prior inconsistent statements in the present case.

¶ 47    We note that in an attempt to draw analogy to *Bedoya*, defendants argue in a single sentence that the "significant portions of these prior statements focused on the uncharged crime of stealing narcotics from Bobo and pistol-whipping him." Defendants do not elaborate on how evidence of the narcotics sale and "pistol-whipping" constitutes inadmissible other crimes evidence. We agree with the State that the evidence was part of the set of circumstances as the charged murder and attempted murder and is not properly viewed as other crimes evidence. See, *e.g.*, *People v. Figueroa*, 341 Ill. App. 3d 665, 671 (2003) ("The cases are uniform that although other-crimes evidence is inadmissable to establish a

defendant's propensity to commit crimes, it may be admissible for other reasons. Here, the testimony as to other crimes touches upon the facts leading up to the commission of the crime for which he was charged as well as evidence of his intent and motive.").

¶ 48                               B. *Rule Against Prior Consistent Statements*

¶ 49        Carter and White next argue that the "repetitive" prior inconsistent statements also should have been barred as a prior consistent statement. Drawing on the general rule prohibiting introduction of prior consistent statements, defendants claim that once the court admitted one prior inconsistent statement, the court was prohibited from admitting a second inconsistent statement that was consistent with the first. As defendants acknowledge, this court has rejected the same argument in prior cases. *People v. Santiago*, 409 Ill. App. 3d 927 (2011); *People v. Perry*, 2011 IL App (1st) 0812282; *People v. Maldonado*, 398 Ill. App. 3d 401, 423 (2010); *People v. Johnson*, 385 Ill. App. 3d 585, 608 (2008). While we agree with this court's uniform rejection of the defendants' argument, we write further to address the defendants' claim that the court's decisions "denigrate the reasoning behind the rule against prior consistent statements."

¶ 50        Defendants rely on the "long-established evidentiary rule against admission of a prior consistent statement, unless there has been a charge of recent fabrication or a motive to testify falsely." *Johnson*, 385 Ill. App. 3d at 608 (citing *People v. Emerson*, 97 Ill. 2d 487, 501 (1983)). While defendants acknowledge that courts generally bar introduction of out-of-court statements that are consistent with trial testimony, defendants claim that once an out-of-court statement is admitted as substantive evidence under section 115-10.1, it is no different than in-court testimony. According to defendants, it follows that we should create a bright-line rule prohibiting admission of any prior inconsistent statement under section 115-10.1, where that statement is consistent with a witness's previously admitted prior inconsistent statement.

¶ 51        We recognize that there is an inherent tension between the admission of multiple prior inconsistent statements as substantive evidence under section 115-10.1 and the rule barring admission of prior statements that bolster trial testimony. We do not agree with defendants, however, that the rule barring prior consistent statements, or its "underlying rationale," can so easily be grafted onto the rules allowing for admission of prior inconsistent statements. Courts have long recognized a bar against prior consistent statements, with limited exceptions, because these statements serve no purpose other than to bolster trial testimony. See *People v. McWhite*, 399 Ill. App. 3d 637, 641 (2010) ("Generally, statements made prior to trial are inadmissible for the purpose of corroborating trial testimony or rehabilitating a witness. [Citations.] This is because the trier of fact is likely to unfairly enhance a witness's credibility simply because the statement has been repeated."). Even under the limited exceptions when prior consistent statements are admissible, they cannot be considered as substantive evidence. See *id.*; *People v. Williams*, 147 Ill. 2d 173, 227 (1991) ("[P]rior consistent statements are admissible to rebut a charge or inference that the witness is motivated to testify falsely or that his testimony is of recent fabrication, and such evidence is admissible to show that he told the same story before the motive came into existence or

-9-

before the time of the alleged fabrication.").

¶ 52    Prior inconsistent statements stand on very different evidentiary ground. Prior inconsistent statements are a vital tool to challenge witness credibility by contradicting and discrediting trial testimony. See, *e.g.*, *People v. Smith*, 391 Ill. 172, 176 (1945) ("It is always competent to show that a witness, even though he be the defendant, has made a statement at another time inconsistent with his testimony on the witness stand."). More important to this analysis, if a prior inconsistent statement meets basic requirements of reliability under section 115-10.1, either party in a criminal case may introduce the prior inconsistent statement as substantive evidence. See *People v. Santiago*, 409 Ill. App. 3d 927, 932-33 (2011) ("We are certain that if the defendant had available to him multiple prior inconsistent statements of a prosecution witness, he would seek to introduce each and every one and would do so properly."). Section 115-10.1 is meant to advance the legislature's goal of "prevent[ing] a 'turncoat witness' from merely denying an earlier statement when that statement was made under circumstances indicating it was likely to be true." *People v. Thomas*, 354 Ill. App. 3d 868, 882 (2004).

¶ 53    Thus, while courts have found little value in a prior consistent statement apart from the impermissible bolstering of trial testimony, the legislature has recognized that a prior inconsistent statement not only serves to discredit trial testimony, but may serve as substantive evidence if it meets the requirements of section 115-10.1. While a blanket prohibition (with limited exceptions) makes sense for prior consistent statements, applying that same general bar to inconsistent statements that are consistent with each other would frustrate the legislature's goal of discouraging recanting witnesses. See *Thomas*, 354 Ill. App. 3d at 882. A witness could be questioned as to prior inconsistent statements, but after one is admitted as substantive evidence, the witness would be free to deny other prior statements without a risk that those statements would be admitted as substantive evidence. We conclude that the underlying rationale for the rule against prior consistent statements does not justify obstructing the operation of section 115-10.1. *Cf. People v. Moss*, 275 Ill. App. 3d 748, 756 (1995) ("Section 115-10 contains no limitation on the number of witnesses who may testify. We will not limit the corroborating complaint testimony to one witness."). We decline to create a new evidentiary rule limiting the number of inconsistent statements admitted under section 115-10.1.

¶ 54    Finally, we note that just because a jury can consider a witness's prior inconsistent statements as substantive evidence under section 115-10.1, this does not mean that the door is flung open to admit prior inconsistent statements "without limit," as defendants suggest. The trial judge may "exercise discretion to limit the number of such statements that may be introduced." *Santiago*, 409 Ill. App. 3d at 933 (noting that a party may file a motion *in limine*, asking the judge to limit the number of statements based on their potential prejudicial value). No such motion was made here, and while defendants have not shown that the trial court abused its discretion in admitting the prior inconsistent statements in this particular case, this does not mean that the number of prior inconsistent statements that may be admitted under section 115-10.1 is limitless. In the case at bar, however, we find no error in the admission of the prior inconsistent statements. "Having found no error, there can be no plain error." *People v. Bannister*, 232 Ill. 2d 52, 79 (2008).

¶ 55	Defendants also argue that they were denied effective assistance of counsel because their trial attorneys failed to object to the admission of the prior inconsistent statements. The right to counsel guaranteed by both the United States and Illinois Constitutions includes the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, "[a] defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Manning*, 241 Ill. 2d 319, 326 (2011) (citing *Strickland*, 466 U.S. at 688). Under the first prong of the familiar *Strickland* test, a defendant must show that his trial counsel's performance was deficient:

> " '[A] defendant must show that his counsel's performance was so inadequate that counsel was not functioning as the "counsel" guaranteed by the sixth amendment. Counsel's performance is measured by an objective standard of competence under prevailing professional norms. Further, in order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. [Citations.] Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. [Citation.]' " *Id.* at 326-27 (quoting *People v. Smith*, 195 Ill. 2d 179, 188 (2000)).

Under the second "prejudice" prong, "a defendant must show a reasonable probability that the result of the proceeding would have been different." *Id.* at 327.

¶ 56	As we find no error in the admission of the grand jury testimony for each of the witnesses, we thus conclude that counsel was not deficient for failing to object to its admission. See *People v. Evans*, 209 Ill. 2d 194, 222 (2004) (finding that where the admission of testimony was not error, "counsel was not deficient for failing to object"). We therefore conclude that defendants' ineffective assistance claim fails.

¶ 57	C. *Sending Prior Statements Back to the Jury*

¶ 58	As to the court sending the statements back to the jury, White presents a challenge under the closely balanced prong of the plain-error doctrine and argues that his counsel was ineffective for failing to object. Carter, whose attorney objected to sending the statements back to the jury and raised the issue in a posttrial motion, argues that sending the statements back to the jury was an abuse of discretion and constitutes reversible error.

¶ 59	"The decision whether to allow jurors to take exhibits into the jury room is left to the sound discretion of the trial court." *People v. McDonald*, 329 Ill. App. 3d 938, 947 (2002). The court "will not reverse that decision unless there is an abuse of discretion to the prejudice of the defendant." *Id.* at 948; see also *People v. Williams*, 97 Ill. 2d 252, 292 (1983). The sole complaint raised by both defendants is that the trial court favored the State's theory of the case by including copies of the handwritten statements and grand jury testimony among the exhibits sent back to the jury. We disagree.

¶ 60	Contrary to defendants' claims, the trial court did not send selected pieces of the evidence to the jury that favored the State's case. Rather, the trial court concluded that the written

statements and grand jury testimony admitted as substantive evidence were helpful to the jury's deliberations, where the jury was asked to assess the credibility of the witnesses, along with all of the evidence regarding identification of the shooters. As the trial court explained in ruling on Carter's motion for a new trial, "it's pretty hard for the jurors to figure out without a statement back there what he saw and what he didn't see and when he saw and when he didn't see."

¶ 61    This court has recognized that "[i]n view of the contradictions between [a witness's] statement and his trial testimony, it is understandable that a jury would find it valuable to review the same." *People v. Lee*, 243 Ill. App. 3d 1038, 1044 (1993). In *Lee*, where defendant argued that sending a witness's written statement to the jury "overemphasized the statement and encouraged the jury to reject his self-defense argument," the appellate court found that "[t]he jury was instructed to weigh all of the evidence" and the trial court did not abuse its discretion in allowing the jury to review the written statement. *Id.* Similarly, here we find no abuse of discretion where the trial court made the substantively admitted written statements and grand jury transcripts available for review.

¶ 62    We also do not agree that the mere act of sending the written statements and transcripts back to the jury "placed a judicial stamp of approval" on the statements' content, to the detriment of the witnesses' live testimony. While the jury was able to observe the trial testimony of the witnesses, the jury did not observe the grand jury testimony or examine the handwritten statements. See *People v. Modrowski*, 296 Ill. App. 3d 735, 748 (1998) (finding no error in the trial court's ruling allowing the jury to review a redacted copy of a witness's grand jury testimony that was received as substantive evidence, where the trial court reasoned that "because the jurors had lacked the opportunity to observe [the witness] before the grand jury, the jurors had no recollection of that testimony upon which to rely"). We note that as to every prior inconsistent statement, the jury was specifically instructed to "determine whether the witness made the earlier statement, and, if so, what weight should be given to that statement *** consider[ing] all of the circumstances under which it was made." We find no abuse of discretion in allowing the jury to review these statements.

¶ 63    Having found no error, we find no support for Carter's claim for a new trial or for White's plain-error claim. As to White's ineffective assistance claim, the trial court did not err by sending the statements back to the jury, and White's counsel was therefore not deficient for failing to object. See *Evans*, 209 Ill. 2d at 222. White's ineffective assistance claim fails.

¶ 64    II. Failure to Request Self-Defense and Second Degree Murder Instructions

¶ 65    Defendants next argue that their attorneys at trial were deficient because they failed to request jury instructions on self-defense and second degree murder. While defendants face a strong presumption that their attorneys' decision may have been the product of sound trial strategy (*Manning*, 241 Ill. 2d at 328), defendants claim that the decision not to request the instruction on self-defense or second degree murder cannot be deemed trial strategy because their attorneys actually argued self-defense to the jury. This court has held that "[w]here defense counsel argues a theory of defense but then fails to offer an instruction on that theory

of defense, the failure cannot be called trial strategy and is evidence of ineffective assistance of counsel." *People v. Serrano*, 286 Ill. App. 3d 485, 492 (1997) (citing *People v. Lewis*, 240 Ill. App. 3d 463, 467 (1992)); see also *People v. Chandler*, 129 Ill. 2d 233, 248 (1989). The initial question before us, then, is whether defense counsel argued self-defense to the jury. We find no support in the record for defendants' claim.

¶ 66    In the case at bar, the theory of defense was that the State had failed to present credible evidence that the defendants were the shooters and thus had failed to prove guilt beyond a reasonable doubt. In support of this theory, counsel for White argued that the jury could not rely on the incredible testimony of "convicted felons" the State put on the stand:

> "The State is asking you to base a conviction, you are going to have to find him guilty says the State's Attorney, that's the only verdict you have. The State is asking you to base a conviction on people who they say lied to you, on people who use guns, use drugs, sell guns, sell drugs, are totally unreliable ***."

Counsel for Carter also remarked to the jury, "You saw these guys on the stand, okay. They're a bunch of criminals, thugs, drug addicts."

¶ 67    Defendants concede that defense counsel argued in closing that the State failed to meet its burden of proof, but they point to a single statement by each attorney that purportedly shows that the attorneys also argued that Carter and White acted in self-defense. We agree with defendants that in closing, both their attorneys "suggested that it is ludicrous to believe the claim made by several witnesses those in the posse assembled by Alexander were unarmed." We do not agree, however, that defendants' trial attorneys made these arguments to advance the theory that Carter and White acted in self-defense in shooting at the group across the street. As White's counsel made clear in his closing, the argument that the State's witnesses lied about having guns was part of a larger effort to show that they were unreliable:

> "The witnesses between them, count them up, you heard their testimony, between them had 20 convictions for felonies. The witnesses who the State told you lied to them under oath, lied to you under oath, the witnesses who swore up and down they never had weapons on the street, although some of them were convicted of shooting at cars, the witnesses who swore to you they didn't have weapons on the street, and only two people did although the State's evidence tells you that there were at least three guns and probably closer to seven, that's the State's case ***."

Counsel for White further argued that the State wanted the jury to "[b]ase its decision on liars." Ultimately, counsel for both defendants urged the jury to conclude that, in light of the State's failure to present any reliable evidence, the State had not "come close to proof beyond a reasonable doubt."

¶ 68    On appeal, defendants have only identified statements from their trial attorneys that, in isolation, are possibly consistent with a theory of self-defense or second degree murder. It is clear from a reading of these statements in context that trial counsel for Carter and White were attacking the credibility of the witnesses who testified for the State. We thus find this case distinguishable from the cases relied upon by defendants, where counsel presented the jury with a theory of defense, but then failed to request jury instructions on that defense. See, *e.g.*, *People v. Serrano*, 286 Ill. App. 3d 485, 492 (1997) (concluding that where "defendant

did not dispute that he was present during [an armed robbery], but contended that he was compelled through fear to do it," defense counsel was constitutionally ineffective for failing to request the compulsion instruction); *People v. Gonzalez*, 385 Ill. App. 3d 15, 21 (2008) (finding counsel ineffective where theory of defense to aggravated criminal sexual abuse was defendant's reasonable belief that victim was 17 years or age or older, but counsel "fail[ed] to ensure that jury [was] properly instructed" as to the definition of reasonable belief and the State's burden of proof).

¶ 69    We also cannot agree with defendants that the jury "had no choice" but to find the defendants guilty of murder. Where defense counsel argues that a defendant was justified in killing–and thus admits that the defendant was the killer–but then offers no instruction on self-defense, the jury is left "with no choice but to find defendant guilty of murder." *People v. Lewis*, 240 Ill. App. 3d 463, 469-70 (1992) (finding that where trial counsel told the jury in closing, " 'You got an easy job on Nimrod. If it was justified, you turn him loose, if it wasn't, you convict him,' " trial counsel was ineffective for failing to submit an instruction on justification or voluntary manslaughter); see also *People v. Chandler*, 129 Ill. 2d 233, 248 (1989). Here, the jury was not left with no choice but to find defendants guilty; the jury could have concluded, based on defense counsel's arguments, that the State had failed to prove that the defendants were the shooters, had guns, or were even involved.

¶ 70    Having found that trial counsel for the defendants did not argue self-defense to the jury, we conclude that defendants have not overcome the presumption that the challenged action by their attorneys might be considered sound trial strategy. Even if we assume that there was enough evidence to support a self-defense instruction, defense counsel may have concluded that a self-defense theory would have been incompatible with the theory presented, since it would require defendants to admit to the shootings. See *People v. Gallardo*, 112 Ill. App. 3d 764, 771 (1983) ("[A] defense based on self-defense would have been incompatible with this theory [that State failed to prove that defendant killed victim], since it would require that defendant admit to the killing."); *People v. Jones*, 234 Ill. App. 3d 1082, 1098 (1992) ("Had defendant's counsel requested those jury instructions, defendant's credibility would have been greatly damaged since the theory of self-defense is inconsistent with the theory put forth at trial that defendant was not involved in the shooting and his confession was coerced."); *cf. People v. Gill*, 355 Ill. App. 3d 805, 811 (2005) ("To seek an instruction saying that [defendant's] resistance was in self-defense would be contrary to her counsel's trial strategy and is not error."). The same is true for the decision to forego the second degree murder instruction. "[T]he decision of whether to submit an instruction on a lesser included offense is typically considered to be one of trial strategy that has no bearing on the competency of counsel because counsel could have reasonably believed that the instruction would have converted a likely acquittal into a likely conviction of the lesser crime." *People v. Cathey*, 406 Ill. App. 3d 503, 512 (2010). Defense counsel made the strategic decision to argue that the State failed to prove its case. That defendants' trial attorneys were ultimately unsuccessful in their arguments "does not mean [they] performed unreasonably and rendered ineffective assistance." *People v. Walton*, 378 Ill. App. 3d 580, 589 (2007).

¶ 71    We conclude that the "record here establishes that defense counsel thoroughly investigated and prepared defendant's case and reasonably chose to argue defendant's

complete innocence in the shooting, rather than a justification for it." *People v. Jones*, 234 Ill. App. 3d 1082, 1098 (1992). Defendants' ineffective assistance claim fails.

¶ 72     III. Failure to Move to Strike or Move for Mistrial Based on Witness Testimony

¶ 73     Carter and White contend that their attorneys were ineffective for failing to move to strike the testimony or move for a mistrial after Tyrone Thomas gave "inflammatory" testimony implicating Carter in "several past murders." On direct examination by the State, Tyrone Thomas testified that he only identified the defendants in a lineup because Detective Gallagher had coerced him. Carter's counsel then cross-examined Thomas:

"Q. Mr. Thomas, you mentioned a few minutes ago that when you were viewing the line-up the homicide man had you point–pointed out Mr. Carter to you?

A. Yes.

Q. Can you tell the jury a little bit more about that please?

A. He said–he had me point him out because he is talking about how he then beat so many murders and how they want him off the street. What I got to do with that for?

Q. So the homicide man pointed out who you should pick out of the line-up?

A. Yes."

¶ 74     At the outset, we note that, contrary to defendants' claims, defense counsel did not "elicit" Thomas's testimony regarding the detective's statement that Carter "beat so many murders." The witness testified unexpectedly to a general question calling for "a little bit more" information, and counsel did not continue questioning Thomas or highlight the testimony later at trial or in closing argument. The case before us is therefore in sharp contrast to the primary case relied upon by defendants, *People v. Bailey*, 374 Ill. App. 3d 608 (2007), where the court could not "find a valid trial strategy in defense counsel's *** line of questioning" after defense counsel elicited "inculpatory evidence on cross-examination" and continued questioning, "digging the hole deeper, eliciting damaging testimony not presented as part of the State's case." *Bailey*, 374 Ill. App. 3d at 609, 614.

¶ 75     As to the decision to forego a motion to strike the testimony, we cannot say that that decision constitutes deficient representation. Our supreme court has recognized that an attorney may forego an objection or a motion to strike for strategic reasons. *People v. Evans*, 209 Ill. 2d 194, 221 (2004) ("It is highly possible that defense counsel allowed the statement [regarding other crimes] to pass without objecting to diffuse its importance, rather than object and draw further attention to the statement."); see also *People v. Leger*, 149 Ill. 2d 355, 396-97 (1992); *People v. Owens*, 372 Ill. App. 3d 616, 625 (2007). As defendants acknowledge on appeal, defense counsel may have concluded that the statement was ultimately harmful but decided against moving to strike Thomas's testimony to avoid drawing attention to Gallagher's vague claim about "other murders." Defense counsel also may have viewed Thomas's testimony as more helpful than harmful, concluding that Gallagher's statement supported defense counsel's argument in closing that Detective Gallagher was a "biased cop" who "really didn't care who was charged." Defendants have not overcome the strong presumption that the failure to object was a sound strategic decision by trial counsel.

¶ 76 Defendants additionally argue that defense counsel were deficient by failing to move for a mistrial after the witness was excused. "Generally, a mistrial should be granted where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." *People v. Bishop*, 218 Ill. 2d 232, 251 (2006); *People v. Jackson*, 223 Ill. App. 3d 1045, 1051 (1991). In this case, there was no such occurrence. Thomas's testimony corroborated defendants' claim that Detective Gallagher pressured Thomas to identify the defendants and that Gallagher was a "biased cop." The reference to "other crimes" was actually a muddled reference to an out-of-court claim made by the allegedly biased detective. In the context of the full trial and in view of all the evidence, the fleeting reference to Gallagher's claim that Carter had "beat so many murders" did not deprive the defendant of a fair trial. *People v. Evans*, 209 Ill. 2d 194, 219 (2004) (reasoning that admission of an "isolated and cryptic statement [of other crimes evidence] did not deny defendant a fair trial" and that "[t]he statement was brief and nonspecific, and certainly overshadowed by extensive evidence of defendant's guilt"); *People v. Leger*, 149 Ill. 2d 355, 396 (1992) (finding that a witness's response regarding other crimes "should have been stricken," but concluding that "we do not believe [the witness's] statement alone, taken in the context of the full trial, in view of all the evidence against defendant, amounted to harmful error"). Therefore, if defense counsel had moved for a mistrial, we cannot conclude that there was a "reasonable probability that the motion would have been granted," and thus "defendant cannot establish a reasonable probability that, but for defense counsel's alleged unprofessional error, the result of the proceeding would have been different." *People v. Holmes*, 397 Ill. App. 3d 737, 744 (2010); see also *People v. Williams*, 262 Ill. App. 3d 808, 826 (1994).

¶ 77 Even assuming that defendants' trial attorneys performed deficiently for failing to move to strike or for a mistrial, defendants' ineffective assistance claim fails because defendants have failed to show that "the result of the proceedings would have been different." *Manning*, 241 Ill. 2d at 326. While defendants suggest that the admission of "other crimes" evidence is *per se* prejudicial, the Illinois Supreme Court, by its own assessment, "repeatedly has held that the improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission." *People v. Nieves*, 193 Ill. 2d 513, 530 (2000) (collecting cases).

¶ 78 We also do not agree with defendants that prejudice is especially likely in this case because evidence identifying White and Carter as the shooters came in through prior inconsistent statements admitted as substantive evidence or because some of the witnesses claimed that Detective Gallagher coerced them into making the prior statements. The jury heard testimony from several witnesses that White and Carter were the shooters. The issue of whether defendants were the shooters "turned upon the weight of the evidence and the credibility of the witnesses," and it was "the jury's responsibility to resolve factual disputes, assess the credibility of the witnesses, and determine the weight and sufficiency of the evidence." (Internal quotation marks omitted.) *People v. Illgen*, 145 Ill. 2d 353, 378 (1991).

¶ 79 In view of all the evidence, we conclude that defendants have failed to show a reasonable probability that the result of the proceeding would have been different without Thomas's fleeting reference to Gallagher's claim that Carter "beat so many murders." See *Nieves*, 193

Ill. 2d at 530-31; *People v. Daniels*, 331 Ill. App. 3d 380, 390 (2002) (isolated references to defendant's lack of a gun permit found to be harmless in view of the evidence of the defendant's guilt); *People v. Bryant*, 212 Ill. App. 3d 452, 456-57 (1991) ("[W]e find it highly unlikely the jury focused on this particular piece of testimony in convicting defendant, especially in light of all the other evidence before it. In all probability the result would have been the same ***."). Defendants' trial attorneys were not ineffective for their decision to forego motions to strike and for a mistrial.

¶ 80                          IV. Trial Court's Comments to Jury

¶ 81     Defendants next contend that through his comments to the jury, the trial judge committed reversible error because he expressed an opinion that the jury should need little time to reach a verdict. Defendants concede that they forfeited review of the issue by failing to object at trial, but argue that this court should not apply the plain-error rule in this instance. While the Illinois Supreme Court has previously "relaxed the waiver rule when the asserted error involves the conduct of the circuit court" (*People v. Emerson*, 189 Ill. 2d 436, 485 (2000)), the State argues that this relaxation of the waiver rule is not applicable here in light of the Illinois Supreme Court's decision in *People v. McLaurin*, 235 Ill. 2d 478 (2009), and subsequent cases. See *People v. Thompson*, 238 Ill. 2d 598, 612 (2010) ("We recently explained that under the *Sprinkle* doctrine, the forfeiture rule may be relaxed when a trial judge oversteps his or her authority in the presence of the jury or when counsel has been effectively prevented from objecting because it would have ' "fallen on deaf ears." ' [Citation.] The failure to preserve an error will be excused under the *Sprinkle* doctrine only in extraordinary circumstances, however, such as when a judge makes inappropriate remarks to a jury or relies on social commentary instead of evidence in imposing a death sentence. [Citations.]"). The State therefore contends that we review for plain error. We need not resolve this issue, however, because even if we follow *Emerson* and relax the waiver rule, we still must first determine if there was an error. We find no error in the trial court's comments.

¶ 82     Defendants' claim of error rests on the trial court's comments on the fourth and fifth days of trial. At the end of the fourth day of trial, the trial court commented:

"Ladies and gentlemen, it's been a long day. It's 6:25, so that's long enough for today. As I said before, the case will be over tomorrow. There may be witnesses left to hear tomorrow, but we will finish the entire case tomorrow with evidence, arguments, instructions by me, deliberations by you and that should do it."

On the following day, the final day of trial, the trial court told the jury before lunch:

"All right. That is all the evidence you are going to hear regarding Mr. Demond Carter and Mr. Alan White, but the trial is not finished obviously. At this point, we know you were back there for a long time, and we want you to have, in a manner of speaking, your last meal on the county. I say that in jest, but it is your last meal, and we will let you go to lunch. We will make it 1:40. When you come back, all we have to do is arguments by the lawyers, instructions by me, deliberations by you.

During the lunch hour, don't talk about the case among yourselves, with anybody

-17-

else, don't talk about the case in your presence. We will give you one last meal and see you back here at 1:40 for closing arguments. Thank you very much."

The jury began deliberating at 4:35 p.m. and reached a verdict at 7:35 p.m.

¶ 83        The circuit court has a "great influence on jurors" at all stages of trial and therefore "must 'exercise restraint over [its] utterances and refrain from unnecessary disparagement of issues.' " *Emerson*, 189 Ill. 2d at 485 (quoting *People v. Terrell*, 185 Ill. 2d 467, 487 (1998)). The Illinois Supreme Court has specifically instructed that "statements suggesting that a quick verdict be reached at the expense of a thoughtful verdict [citation] or which reflect the judge's assessment that the facts bear relatively easy resolution are to be avoided [citation], and that it is the effect of the court's statements and not the court's intent that must be examined [citation]." *People v. Shum*, 117 Ill. 2d 317, 345 (1987). "To constitute reversible error, defendant must demonstrate that the comments constituted a material factor in the conviction or were such that an effect on the jury verdict was the probable result." *People v. Brown*, 388 Ill. App. 3d 104, 111 (2009); see also *Emerson*, 189 Ill. 2d at 485.

¶ 84        At the outset, we find inapposite a number of cases cited by defendants involving claims that the trial judge hastened the verdict by communicating to the jury during deliberations, most often when the jury was deadlocked. See, *e.g.*, *People v. Robertson*, 92 Ill. App. 3d 806, 808 (1981) (finding that judge properly instructed deadlocked jury to continue deliberating pursuant to *People v. Prim*, 53 Ill. 2d 62 (1972), but finding reversible error where the judge exerted pressure on the minority jurors by stating " '[y]ou can't be deadlocked' "). These cases involve a particular concern, not present in the case before us, that the judge's comments pressured or coerced minority jurors to conform to the majority view. See, *e.g.*, *People v. Wilcox*, 407 Ill. App. 3d 151, 163 (2010).

¶ 85        Defendants' claim of error here is different. Defendants point to comments from the judge prior to deliberations and argue that the judge hastened the verdict by conveying a belief that the jury should need very little time to resolve the issues. On this claim of error, we find the Illinois Supreme Court's opinion in *People v. Emerson* instructive. In *Emerson*, during *voir dire* for the sentencing hearing of a death-penalty-eligible defendant, the judge told the jury, " 'We have spoken with the attorneys, everybody anticipates that this case will be over next Monday.' " *Emerson*, 189 Ill. 2d at 484. After the first day of the eligibility hearing, the judge repeated his assumption that the case would be finished on Monday. *Id.*

¶ 86        The defendant in *Emerson* complained that the judge's statements conveyed to the jury that the court, and the attorneys, believed the defendant would be found eligible for the death penalty and that an aggravation-mitigation hearing would be necessary, but the supreme court found no error in the judge's comments. *Id.* at 484-85. The court concluded that the comments from the judge were "proper in light of the circuit court's administrative responsibilities," and stated that it could not "conclude that the circuit court's estimate of the length of the sentencing hearing had any effect on the eligibility verdict." *Id.* at 486-87 (noting that the circuit court also told jurors that "if they did not unanimously find defendant eligible for the death penalty" there would be no second phase, and that the circuit court also instructed the jury that " '[n]either by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict

-18-

should be' "); see also *Shum*, 117 Ill. 2d at 345-46.

¶ 87    Like the court in *Emerson*, we find that that the judge was simply fulfilling his administrative responsibilities of informing the jury about scheduling. Here the judge told the jury about the scheduling of testimony and the remaining events of trial. We do not believe that the jury would infer from the judge's comments that he believed the jury should need little time to resolve the issues. First, the court's comments on the penultimate day of trial are ambiguous. We cannot conclude that the jury would interpret these comments to mean that the jury's deliberations must finish the next day. Nor do we read his comments to suggest that the jury should be able to come to a quick resolution. At this point, neither the judge nor the jury knew when deliberations would even begin on the following day. Second, as to the judge's comments before the lunch break, which the judge said were "in jest," defendants do not contend that the jury believed it had to finish deliberating before dinner (the record is silent on whether the jury ate dinner provided by the county), and the judge never indicated that the jury would need to finish deliberations that day. While we must judge the trial court's comments by their effect on the jury, defendants read too much into the court's comments. Finally, the trial judge here instructed the jury that " '[n]either by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be.' " See *Emerson*, 189 Ill. 2d at 484; *cf. Brown*, 388 Ill. App. 3d at 111. We conclude that defendants have failed to show that the trial judge's comments had a probable effect on the jury's verdict, and we therefore find no error.

¶ 88                              V. Sentencing Enhancement

¶ 89    Defendants next argue that the trial court erroneously added fifteen years to their murder sentences. The State charged both Carter and White with murder while in possession of, and while personally discharging, a firearm. During the instruction conference, the State withdrew the jury instruction regarding personal discharge of a firearm:

"THE COURT: There are some other things here, [Assistant State's Attorney] O'Garek, about the personal discharge, etcetera, are you going to get involved in this? That could tend to confuse the jurors. You don't have to worry about any enhancement.

MS. OGAREK: Could I have a moment, Judge?

THE COURT: Sure.

(Whereupon there was a short pause in the proceedings.)

MS. OGAREK: That's fine, Judge. Judge, I withdraw the additional sentencing factors.

THE COURT: There's no instruction on enhancement, personally discharging a firearm. That's it for the State, then."

After the jury returned a verdict of guilty on the charge of murder, without any instructions referring to the possession of and personal discharge of a firearm, the court imposed the 15-year enhancement on White and Carter for possession of a firearm. See 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2006) ("if the person committed the offense while armed with a firearm,

15 years shall be added to the term of imprisonment imposed by the court"). Defendants did not object at the sentencing hearing or in a posttrial motion and now seek to vacate the 15-year sentencing enhancement.

¶ 90    The State and defendants initially dispute the nature of the error and whether that error is a structural error that requires automatic reversal of the 15-year sentence enhancement. See *Thompson*, 238 Ill. 2d at 613 ("[A]utomatic reversal is only required where an error is deemed structural, *i.e.*, a systemic error which serves to erode the integrity of the judicial process and undermine the fairness of the defendant's trial." (Internal quotation marks omitted.) (quoting *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009))). Defendants characterize the trial court's actions as "removing from the jury's consideration a fact that must be determined by a jury before a court can impose an enhanced sentence." Defendants argue that the trial court effectively "directed a verdict as to the sentence enhancement" and that such an error is a structural error. The defendants cite several statements by the United States Supreme Court to support the contention that a trial court's grant of a directed verdict in a criminal jury trial is structural error. For example, in *Rose v. Clark*, the United States Supreme Court explained:

> "[H]armless-error analysis presumably would not apply if a court directed a verdict for the prosecution in a criminal trial by jury. We have stated that 'a trial judge is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict . . . regardless of how overwhelmingly the evidence may point in that direction.' *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572-573 (1977) (citations omitted). Accord, *Carpenters v. United States*, 330 U.S. 395, 408 (1947). This rule stems from the Sixth Amendment's clear command to afford jury trials in serious criminal cases. See *Duncan v. Louisiana*, 391 U.S. 145 (1968)." *Rose v. Clark*, 478 U.S. 570, 578 (1986).

See also *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993) (explaining that a judge "may not direct a verdict for the State, no matter how overwhelming the evidence").

¶ 91    As to the claim of error, the State references *Apprendi v. New Jersey*, 530 U.S. 466 (2000), where the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. An *Apprendi* error is not a structural error and does not warrant automatic reversal under the second prong of the plain-error doctrine. *People v. Nitz*, 219 Ill. 2d 400, 412 (2006) (rejecting "defendant's contention that the *Apprendi* error in this case is structural"); *People v. Crespo*, 203 Ill. 2d 335 (2001); *Washington v. Recuenco*, 548 U.S. 212, 222 (2006) ("Failure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error."). Defendants must therefore prove, under the first prong of the plain-error test, that the *Apprendi* error was "prejudicial" by showing that it "affected the outcome in a closely balanced case." See *Nitz*, 219 Ill. 2d at 415.

¶ 92    We agree with the State that any possible error arising from the trial court's actions is properly viewed through the lens of *Apprendi*, not as an impermissible "directed verdict." Defendants ask us to draw a distinction between "a mistake or a failure to instruct the jury"

on a sentencing factor (an *Apprendi* error) and the trial court's "conscious finding of guilt before submitting the case to the jury" on the sentencing factor (which the defendants equate to a "directed verdict"). We disagree with defendants' characterization of the error.

¶ 93 Defendants would of course acknowledge that the judge did not "order the entry of a verdict" as to the underlying criminal charges. See Black's Law Dictionary 459 (6th ed. 1990) (definition of "directed verdict"). The cases defendants cite regarding "a directed verdict" refer to a directed verdict on the charge or a "judgment of conviction," not a sentencing enhancement that can only be applied when the jury returns a verdict on the underlying charge. See *Rose*, 478 U.S. at 578 (quoting *Martin Linen Supply Co.*, 430 U.S. at 572-73). Additionally, the Supreme Court has explained that it "emphasized in *Rose* that 'while there are some errors to which [harmless-error analysis] does not apply, they are the exception and not the rule. [Citation.] And *Neder* makes clear that harmless-error analysis applies to instructional errors so long as the error at issue does not categorically 'vitiat[e] all the jury's findings.' [Citation.] " (Internal quotation marks omitted.) (Emphasis omitted.) *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (*per curiam*) (citing *Neder v. United States*, 527 U.S. 1, 11 (1999)).

¶ 94 We also disagree with defendants' characterization of the error because we do not read the record to indicate that the judge made a "conscious finding of guilt" as to the firearm enhancement. We note our disapproval of the trial court's colloquy with the State as to offering a jury instruction on the sentencing enhancement, which gives rise to the defendants' claims on appeal. This discussion should not have occurred. The trial court must be especially careful to avoid any statements or actions that could possibly suggest collaboration with a party. However, we do not find evidence in the record that the trial court had any agreement with the State regarding the enhancement or that trial court's ultimate plan was to impose it at sentencing. While the judge commented that "You don't have to worry about any enhancement," we take the judge's comment to mean that the prosecutor did not have to submit the enhancement because it was not essential to the murder or attempted murder charges. The record shows that before the jury the trial court asked if the prosecutor wanted to withdraw the instruction, which the trial court believed might confuse the jurors. This is not a "directed verdict" as to the sentencing enhancement.

¶ 95 While defendants argue that courts have drawn a distinction based on whether the judge's actions can be described as a failure to instruct the jury or an affirmative ruling to remove some fact from the jury's consideration, we find no case law supporting their claim. In *Neder v. United States*, for example, where the United States Supreme Court found no structural error when the judge made a factual finding as to an element of the crime but failed to instruct the jury as to that element, the trial court instructed the jury that "it need not consider the materiality of any false statements even though that language is used in the indictment" and that the materiality question "is not a question for the jury to decide." (Internal quotation marks omitted.) *Neder v. United States*, 527 U.S. 1, 6 (1999). The Court's ruling as to whether an error is structural in this context did not hinge on whether the trial court mistakenly failed to instruct the jury or whether the court made an affirmative ruling that the instruction should not be given.

¶ 96 We also reject defendants' claim that the trial judge committed error because he

-21-

"infringed upon traditional prosecutorial discretion." While "the State's Attorney is endowed with the exclusive discretion to decide which of several charges shall be brought, or whether to prosecute at all" (*People v. Jamison*, 197 Ill. 2d 135, 161 (2001)), here the judge simply asked the State if it wanted to submit the firearm enhancement instruction to the jury. The defendants claim that the prosecutor's decision not to submit the firearm instruction to the jury was akin to a decision to completely abandon prosecution of the sentencing enhancement. We disagree. While there may be a claim of error under *Apprendi*, *i.e.*, that the trial court erred by imposing the sentencing enhancement without submitting the issue to the jury, the trial court did not impinge on the State's Attorney's discretion to initiate and manage its prosecution of this case.

¶ 97    We therefore consider the alleged error under *Appendi*. We must decide whether the trial court in fact violated *Apprendi* by imposing the 15-year sentencing enhancement and consider whether, under the first prong of plain-error analysis, the error "affected the outcome in a closely balanced case." *Nitz*, 219 Ill. 2d at 415. The State bypasses the question of whether the court committed an error and argues that defendants cannot prevail under the closely balanced prong of the plain-error doctrine. See *People v. White*, 2011 IL 109689, ¶ 134 ("[W]e need not resolve whether there was error here because, under a closely balanced analysis, defendant cannot establish prejudice."). The State contends that even if the defendants are correct that the trial court "remov[ed] from the jury's consideration a fact that must be determined by a jury before a court can impose an enhanced sentence," the trial court decision should stand because defendants cannot prove they were prejudiced by the error. We agree.

¶ 98    Even assuming the court violated *Apprendi* by imposing the fifteen-year sentence enhancement, defendants cannot show that the failure to instruct the jury on the sentencing enhancement "affected the outcome in a closely balanced case." See *Nitz*, 219 Ill. 2d at 415. Alexander was shot multiple times, and Nelson was shot in the back. Several witnesses around Nelson identified White and Carter as shooting at them from across the street, and witnesses also identified White and Carter as shooting from the white van near where Alexander was found. Here, the evidence clearly establishes that defendants were armed when they committed the charged offenses, as required by the sentencing statute. We conclude that a jury, presented with these facts, would have found that the defendants were armed with firearms when committing the offenses. See *Crespo*, 203 Ill. 2d at 348-49; *Nitz*, 219 Ill. 2d at 415. Assuming the trial court erred by imposing the sentencing enhancement without submitting an instruction to the jury, the defendants cannot show that they were prejudiced by the error.


¶ 99                    VI. Carter's Right to Conflict-Free Trial Counsel

¶ 100   The final ineffective assistance claim we address is raised by Carter alone. Carter argues that he was denied his sixth amendment right to conflict-free counsel because his trial counsel represented a potential State witness, Montrell Knight. "A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *People v. Morales*, 209 Ill. 2d 340, 345 (2004). "Such representation means

assistance by an attorney whose loyalty to his or her client is not diluted by conflicting interests or inconsistent obligations." *People v. Taylor*, 237 Ill. 2d 356, 374 (2010).

¶ 101    Carter's trial counsel represented Knight on weapons-related charges stemming from recovery of weapons at Knight's apartment. Among the weapons found in Knight's apartment were two guns used in the shooting. Knight pleaded guilty to the weapons charges before trial in the present case. Also before trial, the State informed the trial judge of the potential conflict because Knight was a potential witness for the State. The prosecutor explained that upon her review of the file she did not believe Knight would be called, but upon a second look she realized it was possible Knight would testify. The judge instructed the parties to interview Knight and determine if he would testify or implicate defendant Carter. The court then asked counsel for Carter about this situation, and counsel for Carter stated that he stated he "didn't see an issue" and that "[m]y information from him is that he can't name who he got the gun from because he said he didn't know. I would not anticipate any names." Before jury selection, the prosecutor told the trial court she did not expect Knight to testify following her conversation with him. Knight did not testify.

¶ 102    Carter raises three arguments in support of his ineffective assistance claims. We find none of these arguments persuasive. First, we find no constitutional violation based on the trial court's inquiry into the potential conflict of interest. Carter argues the trial court failed to adequately inquire into the potential conflict before trial, in violation of *Holloway v. Arkansas*, 435 U.S. 475 (1978). In *Holloway*, counsel for three codefendants timely moved for the appointment of separate counsel based on a conflict of interest, and the United States Supreme Court "held that under those circumstances the trial judge must either appoint separate counsel or take adequate steps to ascertain that the risk of conflict is too remote to warrant doing so." *Morales*, 209 Ill. 2d at 348 (citing *Holloway*, 435 U.S. at 484). In contrast, the Illinois Supreme Court in *Morales* plainly rejected application of the *Holloway* rule where the prosecutor, not defense counsel, informed the court about a possible conflict in the early stages of a case. *Id. Morales* controls here. The trial judge was not required to conduct a *Holloway* inquiry where it was counsel for the State who raised the potential conflict.

¶ 103    Second, we do not agree that there was a *per se* conflict of interest. The Illinois Supreme Court has recognized two categories of conflicts of interest: *per se* and actual. "A *per se* conflict of interest exists where certain facts about a defense attorney's status engender, by themselves, a disabling conflict," and thus a *per se* conflict is grounds for reversal unless the defendant waived his right to conflict-free counsel. *Taylor*, 237 Ill. 2d at 374-75. Our supreme court has identified three specific situations where a *per se* conflict exists: "(1) where defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) where defense counsel contemporaneously represents a prosecution witness; and (3) where defense counsel was a former prosecutor who had been personally involved in the prosecution of defendant." *Id.* "If a *per se* conflict is found, there is no need to show that the conflict affected the attorney's actual performance. Unless a defendant waives his or her right to conflict-free representation, a *per se* conflict of interest is grounds for automatic reversal." *Id.* at 374-75. While the Illinois Supreme Court has found a *per se* conflict where "defense counsel contemporaneously represents a prosecution witness," the supreme court refused to apply the

-23-

*per se* rule where defense counsel represents a potential witness. *Morales*, 209 Ill. 2d at 346. Again, we are bound by *Morales*, where the Illinois Supreme Court found no *per se* conflict when defense counsel represents a potential prosecution witness.

¶ 104    Finally, we conclude that counsel for Carter was not laboring under an actual conflict of interest. If no *per se* conflict exists, a defendant "may establish a violation of his right to effective assistance of counsel by showing an actual conflict of interest that adversely affected his counsel's performance." *Morales*, 209 Ill. 2d at 348-49. To prove an actual conflict, defendant must point to " 'some specific defect in his counsel's strategy, tactics, or decision making attributable to [a] conflict.' " *Id.* at 349 (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 18 (1988)). "Speculative allegations and conclusory statements are not sufficient to establish that an actual conflict of interest affected counsel's performance." *Id.*

¶ 105    On appeal, Carter argues that his trial counsel's conflicting interests resulted in him "totally abandoning any theory of defense that involved Knight," while counsel for White made Knight "the centerpiece of his defense." The record belies this claim. While Carter argues that counsel for White referred to Knight as the "elephant killer" in the case (supposedly a take on "the elephant in the room") during closing argument, White's counsel in fact stated that "those guns, that elephant killer, was in Montrell Knight's possession, nobody else." White's counsel was not pointing the finger at Knight; he was arguing that there was "not a shred of evidence" to connect Knight–and the guns found in his apartment–to White or Carter. Moreover, although Carter's appellate counsel argues that Carter's trial counsel "made no mention of Knight at all" in closing, Carter's counsel in fact raised arguments similar to those raised by White's counsel, arguing that "[t]here's no connection between Montrell Knight and these two gentlemen who are on trial." Finally, while Carter argues that his counsel failed to question witnesses about Knight, while White's defense counsel "repeatedly questioned" witnesses about Knight's "potential involvement in the case," counsel for White simply established that the guns were found at Knight's house and that Detective Gallagher never asked any witnesses if they had seen Knight at the scene, but did not use this testimony to show that Knight had committed the crime.

¶ 106    Carter's claims are wholly conclusory and are insufficient to establish an actual conflict of interest. *Morales*, 209 Ill. 2d at 349. On appeal, Carter presents an alternative strategy that counsel for both White and Carter chose not to pursue, either because there was inadequate factual support or because they made a decision that their chosen strategy was the better one. Carter has not shown, however, that his trial counsel was laboring under an actual conflict of interest that affected his performance. We find no violation of Carter's sixth amendment right to conflict-free counsel.

¶ 107                                CONCLUSION

¶ 108    For the reasons set forth above, we affirm the defendants' convictions for first degree murder and for attempted first degree murder.

¶ 109    Affirmed.